**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| JOHN GULIUS | * | CASE NO: |
| 130 Heather Hill Road | | |
| Bear Creek, PA 18602 | * | (Judge _____) |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | **COMPLAINT FOR DAMAGES; WITH** |
| | | **JURY DEMAND ENDORSED** |
| HEADS UP CYLINDER HEADS, LLC | * | **HEREON** |
| 328 Industrial Ct. | | |
| New Lebanon, OH  45345, | * | |
| | * | |
| Also serve at: | | |
| April K. Brewer, Registered Agent | * | |
| 3870 Indian Ripple Road | | |
| Beavercreek, OH  45440, | * | |
| | * | |
| and | * | |
| | | |
| RANDALL K. BREWER | | |
| 1247 Johnsville Brookville Road | | |
| Brookville, OH 45309, | | |
| | | |
| and | | |
| | | |
| Does 1 through 10, | | |
| | | |
| Defendants. | | |

---

**COMPLAINT**

COMES NOW, the Plaintiff, John Gulius d/b/a John Gulius Racing Engines, a sole proprietorship, ("Gulius" or "Plaintiff"), by counsel, Bieser, Greer & Landis, LLP, and in support

of his Complaint, makes the following allegations and prayers for relief against the Defendants Heads Up Cylinder Heads, LLC ("HUCH"), Randall K. Brewer ("Brewer") individually, and DOES 1-10. Gulius alleges on information and belief as follows:

## PARTIES

1. At all times relevant herein, Plaintiff Gulius was, and is, a citizen of Pennsylvania, located at 130 Heather Hill Road, Bear Creek, PA 18602, and he has owned and operated a racing engine building shop as a sole proprietorship known as John Gulius Racing Engines.

2. At all times relevant herein, Defendant HUCH was and is a for profit limited liability company existing under the laws of the State of Ohio, with its principal place of business located in New Lebanon, Ohio, in Montgomery County with an address of 328 Industrial Court, New Lebanon, Ohio 45345, and its Registered Agent being April K. Brewer with an address of 3870 Indian Ripple Road (REAR), Dayton, Ohio 45440.

3. At all times relevant herein, Brewer was, and is, a citizen of Ohio with an address of 1247 Johnsville Brookville Road, Brookville, Ohio 45309, and he has owned and operated HUCH.

4. At all relevant times, as alleged more fully herein, HUCH, Brewer, and Does 1-10 acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants.

5. Plaintiff is ignorant of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sues those parties by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when they are ascertained.

Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that Plaintiff's injuries as herein alleged were proximately caused by such defendants.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the Plaintiff and the Defendants have complete diversity of citizenship and the sum or value of the matter in controversy exceeds $75,000.

7.      This Court has personal jurisdiction over HUCH and Brewer.

8.      Venue is proper in the Southern District of Ohio because HUCH and Brewer conduct business in southern Ohio, with a principal office located in New Lebanon, Montgomery County, Ohio.

## INTRODUCTION

9.      Plaintiff, Gulius has been described as a guru of custom building stock and super stock engines for drag racing.

10.      Plaintiff essentially began his engine building business on a fulltime basis in 1972, acquiring tools and machines over time at substantial out-of-pocket cost.  Plaintiff spent thousands of hours in the ensuing years doing research and development ("R&D") work. Building on years of experience, R&D, and investment of his own funds, Plaintiff achieved success building National Hot Rod Association ("NHRA") legal "class of the field" engines for Stock, Super Stock and Competition Eliminator NHRA racing classes.  Cars equipped with Plaintiff-built engines set approximately 200 class records, national records and/or won NHRA sanctioned racing events.

11.      Indeed, Plaintiff's success made him a highly sought after engine-builder among racers competing in organized drag racing all over the United States and Canada.

12.     With consistent record-setting and event winning success comes extra scrutiny. When a driver and car set an NHRA National record, that car's engine is stripped down and inspected to ensure compliance with NHRA rules.  Each and every time Gulius-built engines have been inspected, they have been certified to be 100% compliant with NHRA's rules.  Plaintiff's electronic fuel injected ("EFI") engines have met both the letter and intent of the racing standards and rules set by the NHRA, and have never been declared illegal in any respect.

13.     Naturally, success breeds contempt from competitors.  Two such competitors are Randall K. Brewer and his company, HUCH, and non-party Jeff Taylor ("Taylor"). Taylor runs his own shop, Jeff Taylor Performance Engines, Inc., ("JTPE") in Indiana, at which he works on engine cylinder heads and manifolds.  Neither Taylor nor Brewer have been able to achieve with their engines what Plaintiff has achieved with his engines.  Try as they might, Gulius engines have consistently out-performed engines affiliated with Taylor's and Brewer's work, regularly besting them in competition and setting more class records.  At some point, Taylor attempted to purchase an engine or at least cylinder heads from Plaintiff, presumably for the purpose of reverse engineering them.  Plaintiff naturally declined to make that sale.  Thwarted by his attempt to imitate Gulius' engines, Taylor and Brewer concocted a plan to smear Gulius in the racing community and destroy his business.  Unfortunately, as alleged in more detail below, the plan worked.

14.     The gist of Taylor and Brewer's plan, together with help from the NHRA and its agents and insiders, non-parties Wesley Roberson and Daniel "Danny" Gracia, among others, was: 1) to spread false, defamatory, and business-destroying information about the respected Gulius engines; 2) convince the NHRA to help them with their desire to put Gulius out of business by changing its rules to outlaw what makes his engines so successful, and 3) to spread the word to racers that they should not buy his engines or continue to have Plaintiff service them because they

were about to become "illegal." With both passive and active assistance from the NHRA, Taylor

and Brewer put that plan into effect over the course of 2019, and successfully convinced the NHRA

to aid their conspiracy against Gulius and end his business by outlawing his engines. By early

December of 2019, the NHRA announced the rule changes that would effectively destroy Gulius'

business and cause him to close up shop completely.

15. Plaintiff's engine building business shuttered as a result of Defendants' conspiracy

and wrongful actions, but he has not crossed the finish line in this fight. By this action, and the

sister litigation filed in the United States District Court, Central District of California, against

NHRA, Case No. 2:20-cv-02011-DMG-RAO, as well as a separate lawsuit to be filed against

Taylor and JTPE, Gulius intends to vindicate himself, his engines, his stellar reputation, and his

standing in the racing community that he spent decades building.

## FACTUAL BACKGROUND

### A. The Anatomy of an Engine

16. Other than electric cars, the power plant of an automobile is an internal combustion

engine so called fuel and air combust *inside* the engine to create the energy to move the pistons

which are connected to the crankshaft, which in turn moves the car.

17. The engine block serves as the foundation of an engine. The engine block is also

referred to as the "cylinder block" because of the big hole or tubes called "cylinders" that are cast

into the integrated structure. The cylinder is where the engine's pistons slide up and down.

Generally, the more cylinders an engine has the more powerful it is. In addition to the cylinders,

other ducts and passageways are built into the block that allow for oil and coolant to flow to

different parts of the engine.

18.     The cylinder head is a piece of heavily machined metal that is fastened to the engine block directly above an engine's cylinders and pistons. There are indentations cast into the cylinder head in order to create room at the top of the chamber for combustion. A head gasket seals the joint between the cylinder head and cylinder block. Intake and exhaust valves, spark plugs, and in modern engines fuel injectors are also mounted to the cylinder head.

19.     For decades, cylinder heads have been shaved or "milled" at various angles to increase the fuel and air mixtures that flow into engines, thereby making it more efficient and powerful.  Milling cylinder heads to any degree an owner and/or engine builder wants has nearly always been legal for various NHRA classes, as long as a sufficient portion of the cylinder head as manufactured remains, as specified by the NHRA rules for certain classes of competition.  Other than that requirement, there has never been a restriction or a rule by the NHRA on the degree of allowed angle milling on a cylinder head for those classes of competition for which Plaintiff builds his engines, until the NHRA's rule change in early December 2019, which rule change was caused by the wrongful conduct of Brewer and Taylor, with an assist from the NHRA, as set forth below.

20.     When cylinder heads are angle milled, it often creates a gap between the milled surface of the cylinder head and the intake manifold, which gap has to be filled. What is normally used to close the gap created by the angle milling a cylinder head is known as a "spacer."  It is a fabricated and/or machined piece of metal that mates up with both the angle milled top of the cylinder head and the mounting flange of the intake manifold.  It is normally a "free floating" piece, meaning that it is secured to both the cylinder head and the intake manifold when in use, but is easily removed from both.  Spacers have been commonly and legally used on engines for various classes of competitors for decades, until early December 2019, when the NHRA changed its rules based on the wrongful conduct of all Defendants.

21.     However, Gulius does not use "free floating" spacers, rather he fabricates and machines intake manifold extenders which are permanently affixed to the intake manifold by one or more of several attaching methods such as welding, use of epoxy cements and/or screw bolts, such that it becomes an integral part of the intake manifold itself.  Accordingly, when an intake manifold is removed from a cylinder head, the extended piece is removed as part of the intake manifold to which it has been permanently affixed.  As such, it is not considered to be a "spacer."

### B.     NHRA, its Races and Rules

22.     As the most prominent governing body in drag racing, the NHRA set the rules by which participants must abide and is responsible for enforcing those rules.  The NHRA holds a series of major races throughout the season, including the Lucas Oil NHRA Winternationals in Pomona, California, the NHRA Southern Nationals in Atlanta, Georgia, the NHRA Sonoma Nationals in Sonoma, California, and the NHRA U.S. Nationals, held in Indianapolis, Indiana.  It also sanctions local races at drag strips located all across the country.  All of these events are performance drag-racing competitions that award prizes for top performances in certain classes including "Stock" and "Super Stock" classes – the very classes for which Gulius builds his engines.

23.     Stock and Super Stock Racing is performance-based "sportsman" (non-professional) drag racing, with cars organized in classes based on NHRA-rated horsepower to factory shipping weight ratios. Class runoffs held at various NHRA national events during the year allow a racer to demonstrate their highest levels of engine building, performance chassis tuning and driving skills.  The NHRA U.S. Nationals (called, "Indy") is the "Daytona 500" of these NHRA national events.  The enormous challenge to be the fastest in class at Indy draws racers from all over the country to compete for the coveted "Wally" trophy at the U.S. Nationals, as well as cash and product prizes.

24.     These races demand the pursuit of maximum performance from a factory built automobile with mostly original equipment ("OEM") components. NHRA has compiled a "Stock" car classification guide that lists engines and transmissions available in domestic cars from 1955 to the present. A racer chooses a car with a factory-built engine and transmission combination, and seeks to make it as fast as possible using factory parts, modified as the NHRA rules allows, and/or NHRA-permitted aftermarket parts.

25.     More strict rules apply to Super Stock engines, which must use factory matching blocks, cylinder heads, and carburetors. Engine modifications are limited to the addition of aftermarket intake manifolds, exhaust headers, and valve train components.

### C.     John Gulius Makes a Name for Himself

26.     After achieving great success in NHRA Stock, Super Stock and Competition Eliminator classes, Plaintiff began concentrating primarily upon engines for the Super Stock classes starting approximately 25 years ago.

### D.     Taylor and Brewer are Competitors

27.     With the legalization by NHRA of using Electronic Fuel Injection ("EFI") in place of the traditional carburetor, Gulius focused his time and R&D efforts on building the best EFI engines possible for the Super Stock classes.

28.     Focusing primarily on the "small block" Chevrolet V8 engines, his continued and exclusive R&D into various unique combinations of cylinder heads (with NHRA legal modifications), intake manifolds and camshafts has yielded what are arguably the best NHRA legal Super Stock EFI small block Chevrolet engines available, which put a "target on his back" by other engine builders, such as Taylor and Brewer, who could not match the performance of the Gulius engines.

29.     Non-party Jeff Taylor has owned JTPE for approximately 17 years.  Prior to opening JTPE, he worked with his brother for twenty-six (26) years at Taylor Engines in Lumberton, North Carolina. He refers to himself as "the single most decorated professional in [his] field," and claims that for every Gulius engine that has beaten one of his engines, he has two engines that have beaten Gulius engines in other races. However, the NHRA's national class records do not support this assertion.

30.     Brewer, and his company, HUCH, operate out of New Lebanon, Ohio.  The company website describes his company as, "the place to go for high performance cylinder head development and machining. Our products have helped numerous customers, friends, as well as Dave [Layer] (the late founder of Heads Up) himself break records, qualify on top, win races, and championships."

31.     While Taylor and Brewer have had success in their own rights, as Gulius engines dominated the competition and set multiple NHRA national class records, Taylor and Brewer became increasingly resentful.  Taylor is primarily an assembler, as opposed to an engine builder, like Gulius.  Brewer is primarily a cylinder head manufacturer whose heads compete with Gulius' for customers and, on information and belief, also assembles some complete racing engines for customers.  In contrast, Gulius is a master craftsman of engines built for drag racing. His understanding of the engineering and components of a power V8 engine is comprehensive and formidable. It is that understanding that allowed him to build exceptional champion engines as described in further detail below.

**E.     Gulius Develops a Successful Engine that Angers the Competition Who Retaliate by Spreading False and Defamatory Statements**

32.     Approximately six or seven years ago, as fuel injected engines became popular, Gulius started turning his attention to those engines.  About three or four years ago, he developed

a manifold and cylinder head combination that worked exceptionally well. The basic design includes a manifold extension for the intake manifold, and milling cylinder heads on the intake side of the head, as well as relocating some intake bolt holes to allow for push-rod clearance. These engine modifications have passed NHRA technical checks numerous times. None of these components were ever hidden from anyone, let alone the NHRA, and were always determined to be "legal" within NHRA rules.

33. Frustrated by Gulius' success with these engines, Taylor and Brewer started to complain about them. While they had not personally seen Gulius' engines' cylinder heads or inspected his intake manifold, they conspired to present false information to the racing community, including constant complaints to the NHRA that Gulius' engines were illegal, for the purpose of eliminating Gulius as an engine builder for the Stock and Super Stock racing classes. *First*, Taylor and Brewer – together with at least one NHRA official, Danny Gracia, spread rumors throughout the field that Gulius was flat out cheating. These rumors, of course, caused Plaintiff's customers to be concerned about placing future orders and cast doubt on Plaintiff's design and construction. Indeed, the NHRA took notice of Taylor's and Brewer's statements by repeatedly tearing down Gulius' engines for inspection (though unable to find anything illegal about them). *Second*, Taylor and Brewer embarked on a campaign of falsely representing to the racing community and the NHRA that Gulius was milling the intake side of the cylinder heads so far that the only bolt holes left were the two end ones above the water ports. They also falsely represented to the NHRA the center bolt holes were gone, and that Gulius was bolting a plate to the cylinder heads and bolting the intake manifold to the plate. Taylor and Brewer's fictional plate story gained traction and, as the lie spread, people refer to Gulius' plates as "magic plates." The truth is that Gulius' cylinder heads always had the stock bolt holes, and the so-called "magic plates" were, in fact, intake

manifold extenders, permanently affixed to the intake manifold.  The NHRA was aware that these representations by Taylor and Brewer were false (because they checked) and knew Taylor and Brewer were making them with knowledge and intent to sabotage Gulius as a competitor.

34.    While his engines were consistently found to be 100% NHRA legal, and anyone could have used his techniques, because his engines were out-performing others, envy, fueled by false statements of illegal "magic plates," led to constant rumors that Gulius was cheating. Wanting to vindicate himself against the backdrop of these lies, Gulius contacted the NHRA and explained the truth versus the lies being told by Taylor and Brewer.  He was informed that as long as the OEM intake bolt holes were still present in their original location after milling, his engines were fine.

35.    But the damage to his reputation persisted.  At the championship racing event in Indianapolis in September of 2019, one of Gulius' customers was clearly the standout of the Super Stock field. That unbridled success should have resulted in unbridled celebration.  Instead, that individual was told to report to "teardown," to have his engine inspected.  While Gulius and the car's owner did not have to consent to the engine being torn down, consent was granted – just to be able to keep holding their heads high when the NHRA did what it could to fan the flame of cheating rumors started by Taylor and Brewer – rumors it had previously addressed with Gulius and confirmed were false.  At this tear down, the racer's engine – a Gulius engine – with its manifold extender installed – underwent an intense inspection by five or so NHRA personnel.  At one point, one of the personnel queried whether they should check the angle on the intake side of the cylinder head, but was told there was no rule on that.  Everything was declared to be 100% NHRA legal, but a cryptic and ominous statement was made at the time, "Well, by today's rules you are 100% legal, but that could change."  When asked by Plaintiff what the statement meant,

no additional light was shed.  Gulius had no way of knowing at the time that Taylor, Taylor's racers, Brewer, and several NHRA officials were conspiring to change the rule to outlaw Gulius' engines entirely.

36.    Several weeks later, a driver using one of Gulius' engines set the Super Stock national record.  That engine was inspected and declared legal.

37.    In October of 2019, at the races in Rockingham, North Carolina, John Fogle took first place in his race with a Gulius engine.  His engine was taken apart by NHRA officials and, once again, declared legal.

38.    The NHRA was aware that this type of engine was all Gulius built because of the ongoing complaints from Taylor and Brewer, as well as the racers who used Taylor and Brewer, and because they could see it every time they tore his engines down.  Although Gulius' engines were cleared each and every time they were inspected, by requiring these inspections, the NHRA purposefully and knowingly contributed to the rumor mill of lies that tainted him with the stink of suspicion.

**F.    Defendants Work Together to Spread Defamatory Material and Harm Gulius**

39.    Pursuant to their scheme, plan and conspiracy, Taylor, Taylor's customers, Brewer, and certain NHRA agents continually spread their lies about Gulius' illegal "magic plates."  As the lies gained traction, they stepped up their campaign against Gulius.  They lobbied the NHRA to make a rules change that would outlaw Gulius' engines and render his business obsolete, while also rendering dozens of racers' cars which used Gulius-built engines essentially useless, thereby severely limiting, if not destroying their ability to compete in NHRA racing.  While they worked to put Gulius out of business with a rule change, Taylor and several NHRA agents, including Travis Miller, Wesley Roberson, and higher-ups with NHRA Technical Services insidiously

spread rumors to racers and others that they should not do any further business with Gulius because his engines would soon be illegal. They spread these rumors in what became a prophecy fulfilled by their own conspiratorial acts.

40. Upon information and belief, Taylor, certain of Taylor's customers, NHRA agents and Brewer worked closely together to spread the "magic plates" lie and lobby for an unnecessary rules change designed to target one person only: John Gulius. Anyone hearing Taylor, Taylor's racers, and Brewer's complaints could have believed that they were competitors engaging in unethical conduct, but because of the participation of NHRA agents, including Wesley Roberson, Travis Miller, and others, in warning customers and potential customers of Gulius engines pursuant to their conspiracy, the false statements that were being spread were given credibility and heft.

41. As agents of the NHRA, including at least two inspectors responsible for certifying engines as legal and NHRA-compliant, people listened to them. Car owners listened. Drivers listened. Customers and potential customers listened. They all respected what these NHRA agents said and trusted that it came from the NHRA. So when they started telling Gulius' customers – car owners/drivers who bought or had ordered his Gulius race engines – that they should probably not purchase or continue to use and update their Gulius engines because his engines would not be legal under NHRA rules by December, they listened.

42. There are numerous instances of NHRA's agents telling owners/drivers that a rule change was going to happen and that existing Gulius engines would thereby become obsolete. These statements coincide in time and substance with Taylor's statements. As a result, owners/drivers who had placed orders with Gulius cancelled them. Owners/drivers who were counted on to service and/or update their Gulius engines did not because they believed they had to

pivot to new engines made by someone whose engines were not about to be made illegal, or simply discontinue participating in NHRA events.

43.     All the while, NHRA was aware of Taylor and Brewer's intentions to harm Gulius, knew Gulius' engines had been found legal multiple times, but worked in tandem with Taylor and certain of his customers to make sure Gulius' engines would soon become illegal, thus destroying Gulius' business. The NHRA was well aware that Gulius focused his entire business on one type of engine, yet they worked in tandem with Taylor, his racers, Brewer, and NHRA technical inspectors to figure out a way to keep Gulius out of competition.

### G.     The Rule Change

44.     The lies about Gulius' "magic plates" having gained traction, Taylor, certain of his customers, Brewer, and a handful of NHRA agents conspired to put the nail in the coffin of Gulius' career as an engine builder.  On information and belief, Taylor, Brewer and NHRA officials conspired in private meetings to drive Gulius out of business.  In Las Vegas, Nevada in late October/early November of 2019, these co-conspirators, Taylor, one of Taylor's racers, and NHRA officials emerged from a secret meeting in Taylor's racer's trailer gloating about the impending rule change finally being a "done deal," and sarcastically declaring that racers using Gulius engines were going to "like" the new rule.

45.     The prophecy from the co-conspirators as they emerged from their secret Las Vegas trailer meeting came true shortly after the meeting.  On December 4, 2019, without any official advance warning whatsoever, the NHRA announced a new rule that immediately rendered all Gulius engines illegal, and therefore, obsolete and destroyed the ability of those using Gulius engines to compete.  Taylor, Brewer, and the NHRA each knew that these super stock engines were all that Gulius built and, as such, the rule change was intended to severely cripple, if not

extinguish, Gulius' business. There is no doubt that the NHRA knew – and shared – this goal at the time it joined the conspiracy and enacted the rule because Taylor and his racers were vocal about the intent throughout the racing industry, including in meeting with NHRA officials.

46.     The NHRA rule change operated to take away the freedom to legally angle mill cylinder heads to any degree desired by the engine builder as long as original bolt holes and other aspects of the cylinder heads remained per official specifications and also outlined the use of so-called "spacers" fabricated sheet metal items used to close the gap in intake manifold to cylinder head muting surfaces caused by angle milling the cylinder heads.

47.     These rule changes, while not targeted against Gulius "on paper," were, in fact, intended by the NHRA to target Gulius' engines to eliminate the previously NHRA legal modifications made by him which made his engines perform so well against the competition.

48.     These rule changes were part of Defendants' tortious scheme, plan, and conspiracy to cripple the Gulius engine program.  Unfortunately, they were successful.

49.     The new rule was clearly designed to target Gulius.  Factors that make it apparent that the rule was a Gulius-targeted rule are that cylinder heads have been angle milled since the 1960s.  The NHRA previously had only established specifications for cylinder head runner volumes, combustion chamber volume, intake/exhaust valve size and valve stem size.  Therefore, the rule change made no sense.  Milling cylinder heads is a machine shop practice that has been in place for over 40 years and used on all makes of engine cylinder heads.  The NHRA has never established a cylinder head length, width, height, or deck surface angle.  The use of intake spacers in the Super Stock class has been the "norm" for over 25 years.  In addition to intake spacers, NHRA has allowed the use of sheet metal and two-piece split intake manifolds in Super Stock classes.  Most importantly, the NHRA knew that Gulius had focused on this type of engine for

years to the point of exclusivity and, with that knowledge, they undoubtedly knew that banning the engine as he constructed it would cripple his business and cause him to close up shop.

50.     With so many engines affected by the rule, it would take Gulius well over two years to be able to replace the cylinder heads already sold, and that could only be accomplished if he stopped all other work in his shop and dedicated every working hour to the task.  That, of course, assumes that his customers could and would pay for the new heads.

51.     Indeed, there was such an uproar from owners/drivers whose $45,000-$65,000 engines were made obsolete and worthless with the stroke of the NHRA's pen, that the NHRA reversed course and cancelled the rule change on January 28, 2020. Although withdrawn, the announcement was intentionally uncertain and accompanied by an unusual, express indication that the rule was subject to further review and possible change the following year.  As Defendants' intended, this mealy-mouthed wording stimulated the rumor mill further, decimating whatever lingering potential there could have been for Gulius to continue his business.  Thus, even with the rule against Gulius' engine modifications withdrawn, Gulius' business was destroyed and doubt justifiably lingered in his customers' minds due to the ambivalent qualifying language.  He was forced to sell his shop and mitigate his damages as best as he could.

52.     Because so much R&D had gone into perfecting the (previously) NHRA legal cylinder head modifications, using intake manifold extenders where necessary, the time and cost of "going back to the drawing board" to develop new superior performance cylinder heads without the ability to angle mill them and to then find the optimal camshaft and intake manifold combinations to work with those cylinder heads were prohibitive.  Further, rather than wait for such new developments by Gulius, all his customers who had placed orders for new engines cancelled them.

## CLAIMS FOR RELIEF

## COUNT I – DEFAMATION PER SE

53.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 52 above, and incorporates them by references as though fully set forth herein.

54.     By way of his profession, Gulius has a personal and professional relationship with his peers and customers that participate in NHRA events across the nation.

55.     Gulius' ability to carry on his profession successfully is dependent upon his reputation with regard to the production of world-class drag racing engines that are compliant with NHRA rules and regulations.

56.     The statements published by the Defendants, as previously alleged, defamed Gulius and specifically sought to injure his profession, trade, and professional reputation and said statements contained myriad false and defamatory statements.

57.     The statements impugn the reputation of Gulius in claiming that he cheated by improperly milling and drilling components to his engine such that the statements gained traction and Gulius' procedure in producing said engines was rumored to have "magic plates."

58.     In its entirety, the statements made were aimed to convey that Gulius was a cheater within the sport and paints Gulius' professional reputation in a false and misleading light.

59.     The statements published by the Defendants denigrating Gulius were made in a manner to rouse suspicion and shatter confidence in Gulius' engine-building prowess.

60.     The Defendants published their defamatory statements with the actual knowledge that the statements made were false, or with reckless disregard as to the truth or falsity of the statements.

61.    The defamatory statements made by the Defendants exhibit express malice and were conceived and disseminated in the spirit of mischief.

62.    The defamatory statements were made to intentionally injure the reputation of Gulius and to diminish the esteem, respect, goodwill, and/or confidence in Gulius as a world class engine-builder.

63.    The defamatory statements were published by the Defendants to excite derogatory feelings or opinions with regard to Gulius and his actions as a world class engine-builder.

64.    The statements disseminated by the Defendants constitute defamation *per se* by reason that the statements impugn misconduct in Gulius' trade, profession, office and/or occupation.

65.    Because of the publication of the defamatory statements, Guilus has been injured in reputation, good name, and standing as a world-class engine builder, and his ability to continue building engines has been detrimentally affected by the actions of the Defendants as set forth herein.

66.    As a direct result of the statements made, Gulius was required to shut down his business after decades of producing the world's top engines to compete in NHRA sponsored events.

67.    Because of the statements made, Gulius will never be able to recover and participate in his life's work, as his reputation has been irreparably damaged.

68.    The Defendants have acted willfully and wantonly with malice, gross negligence, and oppressiveness, in publishing the false and defamatory statements.

69.    The Defendants, and each of them, knew that the injury would result to Gulius by and through the publishing of the defamatory statements.

70.     The conduct of the Defendants, and each of them, as set forth and alleged through this Complaint, is such that punitive damages should be appropriately assessed against them.

71.     The public interest will be served by the deterrent effect that an award of punitive damages would have in the future conduct of the Defendants and other individuals similarly situated.

WHEREFORE, Plaintiff, John Gulius, hereby respectfully requests that this Honorable Court enter judgment in his favor, and against the Defendants, and each of them, for any and all direct, incidental, consequential and statutory damages, suffered by John Gulius and arising out of the actions of the Defendants as set forth in this Count I, for presumed damages as the actions of the Defendants constitute defamation *per se,* punitive damages, costs of this action, reasonable attorneys' fees, and any and all other relief that this Court may deem to be just and proper in the premises.

### COUNT II – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

72.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 71 above, and incorporates them by references as though fully set forth herein.

73.     As set forth and alleged above, the defamatory statements made by the Defendants were published to various NHRA participants and the NHRA itself with whom Gulius had a business relationship.

74.     The Defendants herein expressly knew of the business relationship Gulius had with various NHRA participants and the NHRA itself and knew that Gulius had a reasonable expectation, and a reasonable probability existed, that he would obtain an economic advantage or benefit from his relationships with current and prospective business partners.

75.     By disseminating the defamatory statements to individuals and organizations with which Gulius has a business relationship, the Defendants, and each of them, have intentionally interfered with those relationships.

76.     There is no justification for the actions of the Defendants as alleged herein.

77.     The damages suffered by Gulius, at the hands of the Defendants, are ongoing and not yet ascertainable.

78.     The Defendants have acted willfully and wantonly, with malice, gross negligence, and oppressiveness in publishing the false and defamatory statements and aimed at interfering with Gulius' business relationships with those that participate in NHRA competitions, and any business relationships that he has with any other individuals or entities to whom the defamatory statements were published.

79.     The Defendants knew that injury would result to Gulius by and through the publishing of the defamatory statements.

80.     The conduct of the Defendants, and each of them, as alleged throughout this Complaint, is such that punitive damages should be appropriately assessed against the Defendants.

81.     The public interest will be served by the deterrent effect that an award of punitive damages would have against the future conduct of the Defendants and other individuals or entities similarly situated.

WHEREFORE, Plaintiff, John Gulius, hereby respectfully requests that this Honorable Court enter judgment in his favor, and against the Defendants, and each of them, for any and all direct, incidental, consequential and statutory damages, suffered by John Gulius and arising out of the actions of the Defendants, and each of them, as set forth in this Count II, punitive damages,

costs of this action, reasonable attorneys' fees, and any and all other relief that this Court may deem to be just and proper in the premises.

Respectfully submitted,

/s/ *Matthew M. Suellentrop*
Matthew M. Suellentrop
Atty. Reg. #0089655
*Attorney for Plaintiff John Gulius*
BIESER, GREER & LANDIS, LLP
6 N. Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone:  (937) 223-3277
E-Mail: mms@biesergreer.com
Fax:  (937) 223-6339

## DEMAND FOR JURY TRIAL

Plaintiff John Gulius hereby demands a trial by jury of all issues so triable.

/s/ *Matthew M. Suellentrop*
Matthew M. Suellentrop
Atty. Reg. #0089655

4963.220117/802354